By the Court—Bosworth, Ch. J.
The drawing, accepting and indorsing of the bills, as alleged in the complaint, except the indorsement of them by the American Exchange Bank to the plaintiffs, are admitted by the pleadings. The indorsement to the plaintiffs, by that Bank, was proved at the trial, and thus the apparent legal title in the plaintiffs was established.
Whether the plaintiffs are the legal owners and holders of the bills, or whether they continue to be the property of the Bank of Akron, depends upon the authority of J. W. McMillen, the Cashier of the Bank of Akron, to transfer them to the plaintiffs as they were transferred, and whether the contract as part of which the transfer was made is valid, or void as being prohibited by any law of Ohio by which the plaintiffs’ title can be affected.
The defendant has no defense to a suit upon the bills, by and in the name of the lawful owner of them. His defense is based solely on the alleged absence of any lawful title in the plaintiffs, *440 and on the allegation that the Bank of Akron is the true and lawful owner.
In July, 1851, McMillen, then being Cashier of the Bank of Akron, applied, as such Cashier, to the plaintiffs for the loan of $50,000, of their bills, to the Bank of Akron, for the term of one year.
The plaintiffs agreed to make the loan to the Bank of Akron,' upon the terms; of interest at the rate of four per cent, payable and to be paid semi-annually at the American Exchange Bank, New York, and of the bills so lent, being redeemed weekly at such Bank by the Bank of Akron, as they should be returned to the plaintiffs, and of $60,000 of the collection paper belonging to the Bank of Akron, and held at any time by the American Exchange Bank, being pledged as collateral security to the' plaintiffs, and that while such loan continued there should be at no time less than $60,000 in amount of such paper held by the American Exchange Bank.
A paper directed to the Cashier of the American Exchange Bank, and signed by McMillen as Cashier of the Bank of Akron, stating the fact and terms of such pledge, was delivered to the plaintiffs, and notice of it was given to the Cashier of the American Exchange Bank, who assented to it and agreed to hold the paper so pledged, subject to any claims of the Bank, of which he was Cashier.
The bills to beso loaned were tobe marked in a manner agreed •upon to secure their identification, and were to be furnished to the Bank of Akron, as fast as the convenience of the plaintiffs would allow.
Under this arrangement, the plaintiffs, in August, 1851, commenced sending their bills to the Bank of Akron, and in January, 1852, had -forwarded the whole $50,000. They were forwarded in packages, by express, directed to McMillen, as Cashier of the Bank of Akron, and were received b3r him at that Bank.
As fast as the bills, after they were put in circulation, were returned to the plaintiffs, they were redeemed at the American Exchange Bank, for the Bank of Akron, and on its account, and out of its funds, and thereupon the amount thus redeemed was again returned to the Bank of Akron by the plaintiffs, in the same manner as those originally loaned had been forwarded.
*441 The interest on the $50,000 was regularly paid semi-annually by the American Exchange Bank to the plaintiffs, for and on account of the Bank of Akron, and out of its funds. The loan was continued beyond the time originally agreed upon, and upon the terms on which it was originally made. This course of redeeming the notes, as they came back to the plaintiffs, and of re-issuing and sending to the Bank of Akron the same amount as was from time to time so returned and redeemed, and of paying interest semi-annually on the whole sum loaned, was continued until about the 11th of November, 1854. The American Exchange Bank then declined to redeem notes that had been so returned to the plaintiffs, and thereupon the plaintiffs obtained from that Bank, under the pledge and agreement in relation thereto, a transfer of collection paper held by it belonging to the Bank of Akron, amounting to a little over $59,000, and the paper so transferred included "the bills on which this action is brought.
McMillen, as such Cashier, had authority-to borrow money for the Bank of Akron. To what extent he borrowed for the Bank, the evidence does not disclose. He had, practically, the whole management of the business of that Bank. Its Board of Directors met semi-annually, but according to.the evidence before us, did not, at those meetings, or at other times, inquire as to the details of its business, the mode of its operations, or into the manner in which the Cashier was prosecuting its business.
Under such circumstances, we think the plaintiffs are entitled to have this controversy determined upon the principle, that as between them and the Bank of Akron, the Cashier of the latter was fully authorized to borrow money for it, and in' its name, and that any loan made by the plaintiffs, in good faith, on an application of the Cashier of the Akron Bank, as such Cashier, to borrow for it, is a loan to that Bank, and that such Bank is primarily liable for such loan, as the party borrowing.
In Beers v. Phœnix Class Company, (14 Barb. S. C. R., 858-861,) it was held, that in order to make particular transactions of the officers of a corporation binding upon the corporation itself, it is not necessary to prove they were directly authorized. “ If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a par *442 ticular line of conduct for a considerable period, without objection, they are as much bound to those who are not aware of any want of authority, as if the requisite power had been directly conferred.”
These transactions extended over a period of three years. The bills originally loaned, and those sent as a substitute for bills returned to the plaintiffs in the ordinary course of circulation for redemption, were sent to the Bank of Akron directed to its Cashier, and were received at that Bank by such Cashier.
The bills loaned, as they came back to the plaintiffs, were redeemed from time to time in the name of the Bank of Akron, by its agent in Hew York, the American Exchange Bank, with the funds of the Bank of Akron; and the American Exchange Bank, as such agent, also paid the semi-annual interest on the sum loaned by the plaintiffs to the Bank of Akron, and out of the funds of the latter Bank.
All the letters from McMillen to the plaintiffs relating to his transactions with them, (which are of any importance,) are either dated “Bank of Akron,” or “State Bank of Ohio,” “Bank of Akron, Akron,» Ohio,” and are signed by him as Cashier.
These letters are numerous.
It was said in The New Hope & Delaware Bridge Company v. Phœnix Bank, (3 Comst., 166,) that “ a letter from the Cashier on the business of his Bank is a letter from the Bank; a letter to the Cashier relating to the business of his Bank is a letter to his Bank; and the Bank is chargeable with knowledge of the contents of such letter.”
The American Exchange Bank, as it redeemed' for the Bank of Akron and with its funds, from time to time, the bills returned in the course of circulation to the plaintiffs, and as it also paid' interest for the Bank of Akron out of its funds semi-annually, on the sum loaned, must be presumed to have advised the Bank of' Akron of the fact of such payments. There is no pretense, nor attempt to show that this was not done, nor that the Bank of Akron objected to such acts, or refused to allow such payments, or questioned the power of its Cashier to authorize or direct such payments to be made.
We think it, therefore, quite clear, that the Cashier of the Bank of Akron had authority as such to borrow money for that *443 Bank. That the sum. loaned by the plaintiffs on the application of such Cashier to borrow for that Bank, was a loan to that Bank, and that such Bank is liable for its repayment as the principal in the transaction, and the party borrowing. And that the bills in question were transferred to the plaintiffs to enable them, by a collection of such bills and out of their proceeds, to obtain payment of a debt due to them from the Bank of Akron, and not, as the answer alleges, to obtain payment of a debt due from McMillen to the plaintiffs.
■ There is no force in the objection that the bills so borrowed of the plaintiffs were not, in fact, used by the Cashier of the Bank of Akron, for its benefit and in prosecuting its business, even if the evidence given, is, for the purposes of this action, to be treated as competent and sufficient to establish, prima fade, that fact.
The bills were borrowed for the Bank of Akron, and were loaned to it, and on . its credit and on the security of a portion of its assets, and were sent by the plaintiffs to that Bank, and were received at the Bank by its Cashier, and were retained in its banking house until they were paid out at its counter.
In judgment of law, they came into the possession of the Bank of Akron as absolutely as if they had been delivered to the Board of Directors at a regular and full meeting of its members. What the Cashier or the Directors, or either of them, subsequently did with the bills, cannot impair the plaintiffs’ claim, either at law or in equity.
There could be no doubt of the validity of the transfer of the bills of exchange in question, if it had been directly authorized by the Board of Directors.. There is nothing in any part of the charter of the Bank, which has been given in evidence, that prohibits the delegation of authority to the Cashier to borrow mofiey upon such terms as the loan in question was made, or to transfer such portion of its discounted bills as may be reasonable in amount, for collection, and to pay its just liabilities out of the proceeds thereof when collected. (The City Bank of Columbus v. Bruce & Fox, 17 N. Y. R, 514, 515.)
When, as in this case, the Cashier of a Bank has actual authority to borrow money for it, and the whole management of its *444 business and the mode of conducting its operations are confided by the Directors to him, and so absolutely so, that his operations and mode of doing business are not examined into by them at all for years, a party who deals with and loans money to such Bank, on the faith that, the .acts of such Cashier, in borrowing and securing it, are authorized by his Bank, is as much entitled to protection as if such acts had béen directly authorized, when such acts are of a character that it may reasonably be supposed they have been authorized by the Bank, and the business transactions between such party and such Cashier have been done openly and publicly, and in such manner that the Directors, if they had given even ordinary attention to its business, would have been informed of such transactions, and of the particulars thereof.
Especially should it be-so held, when the contract sought to be enforced is one which the Bank was competent to make, and upholding it violates no rule of law or principle of public policy.
There is no pretense that the nature and extent of the authority of the Cashier of the Bank of Akron have ever been defined by any direct act of the corporation. On the contrary, he has been permitted, as being within the scope and limits of his authority, to exercise a large range of powers, and his own judgment as to the transactions which he deemed to be for the interest of the Bank, and the terms on which he should contract, in ■ making engagements as its agent, which the Bank might lawfully make.
, Such exclusive control and management for so long a period by the Cashier, with the assent of the Directors, amounts to an authority to him to make contracts, in relation to its business which the bank might lawfully make, and will conclude the Bank as between it and a party who has dealt directly with it through such Cashier, and who, on the faith of his having authority to make such a contract, has loaned money to, or paid it for such Bank.
The circumstance, that McMillen gave his own note to the plaintiffs for the sum borrowed, we regard as of no consequence under the particular facts and circumstances of this case. It cannot detract from the force of the fact that the loan was made to the Bank of Akron as the party borrowing, nor impair any obligation which it assumed by the contract made in its behalf and *445 in its name by its authorized agent, to repay the sum borrowed, or in relation to the securities promised, and subsequently in execution of such promise actually transferred to the plaintiffs, as the means and for the purpose of obtaining payment of the sum lent.
If the views already stated are sound, the remaining questions presented by the case can be disposed of briefly.
Such parts of the charter of the Bank of Akron as were given in evidence do not prohibit the Bank of Akron from paying out or putting in circulation any notes issued by any Bank which redeemed its notes in gold and silver, and which the Bank of Akron received at par in payment of debts, if of a denomination not less than $5.
The contract relating to the loan contains no provision conflict, ing with this part of the charter. It "was no part of the contract that the plaintiffs should furnish, or that the Bank of Akron should receive, from them, as part of the loan, any bill of a denomination less than $5.
There is no evidence that the plaintiffs knew of the existence of the general statute of the State of Ohio, entitled, “ An act to amend the act supplementary to the act to prevent unauthorized banking and the circulation of unauthorized bank paper, passed February 24,1848,” sections 1 and 4 of which are inserted in the case.
On the 9th of October, 1854, the Cashier of the Bank of Akron returned to the plaintiffs a package of 5s, amounting to $4,600, with notice that the law of Ohio prohibiting the circulation of foreign bills under 10s took effect on the 1st of that month, and “ causes them to return so rapidly that we are obliged to return these, asking you to please to substitute 10s in their stead, and also for all others you may redeem hereafter.”
There is, therefore, no evidence that the plaintiffs knew, or had reason to suspect, when they agreed to loan the $50,000, or when they furnished the bills to that amount under their agreement to loan, or returned bills which they had redeemed, that the Bank of Akron, or its Cashier in behalf of that Bank, intended to use the bills in a manner or for a purpose prohibited by any statute of the State of Ohio.
Whatever the undisclosed purpose or intent of such Cashier may have been, there is no ground for pretending that the plain *446 tiffs stipulated, as a part of their contract, that anything should be done with the bills loaned that would violate any statute of that State.
' The Merchants' Bank of New York v. Spalding, (5 Seld., 53,) and Tracy v. Talmage, Pres't, (4 Kern., 162,) are decisive of any defense based on the allegation of its being part of the agreement that acts should be done that would violate a known, or, in fact, any statute of the State of Ohio.
The point of the fifth defense is, that “ the plaintiffs improperly got possession” of the bills of exchange on which this suit is brought, “and are attempting to collect them of this defendant,” -x- * “and to apply the proceeds thereof to the payment of a pretended debt due from one J. W. McMillen to the plaintiffs, the consideration of which pretended indebtedness arose out of certain Bank notes of "the plaintiffs, which said McMillen agreed to circulate for the plaintiffs in the State of Ohio, illegally and contrary to the statutes of the State of Ohio."
What the terms of these statutes or their titles are, or when they were passed, is not alleged nor intimated. Nor are the terms of the alleged agreement, as to circulating the plaintiffs' bills, stated either in detail or generally. ,
No agreement to actually circulate is proved. It was undoubtedly expected that they would be paid out in Ohio, and the circulation obtained that might result from such an act. But there was no agreement in respect to the fact of circulation.
No statute is proved, of which the plaintiffs are shown to have had any knowledge or notice, which could have been violated by the circulation of any bills which the plaintiffs agreed to furnish, or, at the time of making the contract, were asked to furnish under it. ,
The plaintiffs hold the bills of exchange sued upon as regular indorsees, and are attempting to collect them to obtain payment of a debt justly due to them from the Bank of Akron. They were delivered to the plaintiffs under a written authority and pledge of them, or a pledge which operated upon them from the moment of such delivery, formally executed by the Cashier of that Bank, upon the faith of, and in reliance upon which pledge, the loan has been continued and extended from one year to three years in duration.
*447 The plaintiffs, if the views we have expressed are correct, did not “improperly get possession” of these bills of exchange, but, on the contrary, obtained possession of them lawfully and for a just purpose, and are attempting to collect them to satisfy" a valid debt owing to them by the Bank of Akron.
They should not be defeated in their action to recover upon them, upon the evidence given at the trial in support of the issues raised by the defendant’s answer.
The motion for a new trial must be denied, and a judgment in favor of the plaintiffs entered on the verdict.
Judgment ordered accordingly.